UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROBERT PETRO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:18-cv-02809-JPH-TAB |
| ) | |
| PAUL TALBOT, ) | |
| WEXFORD HEALTH, ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For the reasons explained in this Order, the defendants' motion for summary judgment, dkt. [41], is **granted.**

## I. Background

Plaintiff Robert Petro alleges that during his incarceration at Pendleton Correctional Facility ("PCF") Dr. Paul Talbot and Wexford Health ("Wexford") failed to adequately examine and treat his back condition and back pain, and failed to examine x-rays to determine a proper course of treatment. *See* dkt. 8 at 2. Mr. Petro alleges that Dr. Talbot and Wexford were "vindictive" by not taking x-rays or performing a medical evaluation before attempting to treat him. *Id.* The Court screened Mr. Petro's complaint on November 1, 2018, and there are two claims before the Court: (1) an Eighth Amendment medical claim against Dr. Talbot; and (2) an Eighth Amendment policy or practice claim against Wexford. *Id.*

Defendants filed a motion seeking summary judgment, and that motion is fully briefed and ripe for resolution.

## II. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because

1

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Facts asserted by a party must be supported by citation to specific parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708,

717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

### III. Discussion

#### A. Material Facts

Dr. Talbot is a physician licensed to practice in the State of Indiana, and at all times relevant to Mr. Petro's complaint, was employed by Wexford of Indiana, LLC, the medical provider for the Indiana Department of Correction, as a physician at PCF. Dkt. 43-1, ¶¶ 1-2.

Several months before he was transferred to PCF on or about May 16, 2018, Mr. Petro had an inguinal hernia repair surgery. *Id.*, ¶ 4. At an initial evaluation on May 23, 2018, Dr. Talbot examined Mr. Petro, reviewed his electronic medical records, and ordered Mr. Petro a low bunk pass for three months due to his hernia repair recovery. *Id.*, ¶ 5; dkt. 43-3 at 13-15. Dr. Talbot testified that Mr. Petro did not discuss scoliosis or his back pain at this exam, and that Mr. Petro had a current prescription for Mobic and Tylenol. Dkt. 43-1, ¶ 5; dkt. 43-3 at 13-15.

On June 27, 2018, Dr. Talbot saw Mr. Petro for psoriasis and prescribed him a topical cream. Dkt. 43-1, ¶ 6; dkt. 43-3 at 10-12. On August 15, 2018, Mr. Petro requested a renewal of his lower bunk pass as his primary concern, which Dr. Talbot denied because the examination of Mr. Petro showed that he was able to ambulate normally and had appeared to have recovered from his hernia surgery. Dkt. 43-1, ¶ 7; dkt. 43-3 at 7-9. At this time, there was no discussion regarding

scoliosis or back pain, and Mr. Petro still had active prescriptions for Meloxicam (Mobic) and Tylenol for pain. Dkt. 43-1, ¶ 7; dkt. 43-3 at 9.

Mr. Petro first complained to Dr. Talbot of persistent back pain during an August 29, 2018 assessment. Dkt. 43-1, ¶ 8; dkt. 43-3 at 4. Dr. Talbot testified that Mr. Petro reported that he had chronic low back pain in his lumbar region since 2013 and sought a back support. Dkt. 43-1, ¶ 8; dkt. 43-3 at 4-6. Dr. Talbot found no limitations to Mr. Petro's ability to ambulate or any restrictions on his ability to perform his daily activities at this time. *Id.* Dr. Talbot continued a prescription of Tylenol for pain and provided exercises for Mr. Petro to strengthen and stretch his back muscles for relief. Dkt. 43-1, ¶ 8; dkt. 43-3 at 6.

Dr. Talbot saw Mr. Petro at a follow up visit on September 19, 2018. Mr. Petro claimed that he had an x-ray in 2011, but that no doctor at his prior facilities had recommended back surgery, he had not engaged in any physical therapy, and he had not received any exercises in the past. Dkt. 43-1, ¶ 9; dkt. 43-3 at 1-3. Dr. Talbot had Mr. Petro perform a straight leg raise, assessed his gait, and looked for signs of obstructed nerves or neuropathy. *Id.* There was no motor atrophy or function limitations. *Id.* Dr. Talbot ordered x-rays of the lumbar spine and the hips, ordered a back support/abdominal binder, provided another exercise plan, and ordered Meloxicam at Mr. Petro's request. *Id.*

On November 21, 2018, Dr. Talbot conducted a follow up assessment with Mr. Petro. Dr. Talbot had located the 2011 x-ray that had been taken at Miami Correctional Facility. Dkt. 43-1, ¶ 10; dkt. 43-3 at 25-27. The x-ray noted moderate levoscoliosis of the lumbar spine with degenerative joint disease, but Dr. Talbot noted no functional limitations. *Id.* Mr. Petro was actively working as a GED instructor and could "perform some exercise." *Id.* He also continued to receive Tylenol, and Dr. Talbot advised him that he could purchase additional over-the-counter

4

pain medication from the commissary and instructed him to refrain from lifting anything and to continue to do his exercises. *Id*. Mr. Petro claimed he had not received a back support, and in response, Dr. Talbot made a second request for the back support. Dkt. 43-1, ¶ 10; dkt. 43-3 at 25.

Dr. Talbot saw Mr. Petro on December 5, 2018 and noted that Mr. Petro had no limitations and could perform his daily activities; that Mr. Petro continued to have a prescription for Tylenol; and that he instructed Mr. Petro to take Pepcid with the Mobic. Dkt. 43-1, ¶ 11; dkt. 43-3 at 22-24 (medical records indicate that Mr. Petro (a) wanted to know why he was on Pepcid, (b) was not asking about a back brace, and (c) did not request a refill on Mobic because he claimed it did not help).

On December 26, 2018, Mr. Petro saw Dr. Talbot for chronic back pain. Dkt. 43-1, ¶ 12; dkt. 43-3 at 19-21. Mr. Petro's recent x-rays "showed some lumbar degeneration but no significant scoliosis." *Id*. Dr. Talbot found that Mr. Petro's complaint "did not correlate with any findings on physical exam or prior x-ray report." *Id*. Dr. Talbot ordered Prednisone "with hopes that this steroid may calm any inflammatory response that was occurring in the back." Dkt. 43-1, ¶ 12, dkt. 43-3 at 21. Tylenol was also continued. *Id*.

Mr. Petro was seen for a follow up visit on January 23, 2019, and he told Dr. Talbot that he did not receive the Prednisone or Tylenol from the previous visit. Dkt. 43-1, ¶ 13; dkt. 43-3 at 16-18. Dr. Talbot entered orders and sent an email to ensure that Mr. Petro received these medications. *Id*. He also performed an assessment for limitations of range of motion in the hips and checked for a pinched nerve and muscle atrophy. *Id*

On March 6, 2019, Mr. Petro requested a back support and told Dr. Talbot that the support he had received was for hernia support. Dkt. 43-1, ¶ 14; dkt. 43-3 at 28-30. Mr. Petro brought the support to the visit, and it was still in the box; he had not attempted to use it. Dkt. 43-1, ¶ 14; dkt.

5

43-3 at 28. Dr. Talbot affirmed this was the correct support and showed Mr. Petro how to use it. *Id.* (item read abdominal binder and was not a hernia support and Mr. Petro "appeared satisfied after consultation"). Mr. Petro stated that he had been doing the exercises but there was no "significant benefit" to them. Dkt. 43-1, ¶ 14. In response, Dr. Talbot submitted a request for on-site physical therapy and renewed the prescription for Tylenol. *Id.*; dkt. 43-3 at 28-30. Mr. Petro's request for a wedge pillow was denied as unnecessary. Dkt. 43-1, ¶ 14; dkt. 43-3 at 28-30.

Mr. Petro began physical therapy with Dana Miller on March 15, 2019. Dkt. 43-1, ¶ 15. Ms. Miller's evaluation found that Mr. Petro could ambulate without an obvious limp and had no atrophy. Dkt. 43-3 at 31. Ms. Miller provided him with several flexibility exercises and believed he would get some relief but noted that he did have "some significant reasons for pain." *Id.* Mr. Petro had a second appointment with Ms. Miller on March 22, 2019 in which he still reported having pain but believed he was on the right track to improvement. *Id.* He was given several core strengthening exercises. *Id.*

When Dr. Talbot saw Mr. Petro for the last time on April 10, 2019, he ordered a wedge pillow based upon the recommendation from the physical therapist in the hopes that it may provide "a little relief," ordered a new back support per Mr. Petro's request, and continued pain medication. Dkt. 43-1, ¶¶ 17; 20; dkt. 43-3 at 35-37. Just twelve days later, Mr. Petro had another appointment with Ms. Miller and still reported pain, but stated he felt he was still on the right track to improvement. Dkt. 43-3 at 39. Ms. Miller reported that Mr. Petro continued to have decreased flexibility but was improving. *Id.* On May 10, 2019, Mr. Petro had a spinal physical therapy appointment and still reported pain but indicated he was "moving better." *Id.* at 41. He reported his wedge pillow was helping reduce his pain while in his bunk. *Id.*

In his deposition, Mr. Petro testified that he was suing Dr. Talbot because Dr. Talbot was unwilling to treat his pain and suffering or assist him all together. Dkt. 43-2 at 19. Mr. Petro contends that Dr. Talbot was "uncaring," sent him the wrong back braces, prescribed the wrong medications, and did not order an x-ray. *Id.* at 19, 44.

Since his release from PCF, Mr. Petro has been evaluated and treated by an outside provider who prescribed Meloxicam and a muscle relaxer, and referred him to a spine specialist and for physical therapy. Dkt. 43-2 at 10-11.

### B. Analysis

At all times relevant to Mr. Petro's claims, he was a convicted inmate. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."). To establish an Eighth Amendment claim for deliberate indifference to serious medical needs, "the plaintiff must prove that he suffered from '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quoting *Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). Under the Eighth Amendment, Mr. Petro is not entitled to

7

demand specific care. *See Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011); *see also Forbes v. Edgar*, 112. F.3d 262, 267 (11th Cir. 1997).

Because Wexford acts under color of state law by contracting to perform a government function, *i.e.* providing healthcare services to inmates, it is treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002). "[M]unicipal governments [including counties] cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional municipal policies or customs." *Simpson v. Brown Cty.*, 860 F.3d 1001, 1005-6 (7th Cir. 2017) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91 (1978)).

For Mr. Petro to succeed on his policy claim, he must designate evidence to show a constitutional injury caused by a Wexford policy or custom. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007). "The critical question under *Monell* … is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents." *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (citing *Monell,* 436 U.S. 658 (1978) and *Los Angeles Cty. v. Humphries,* 562 U.S. 29 (2010)). "Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice." *Id.*

### 1. Dr. Talbot

Mr. Petro testified that he discovered he had scoliosis in 2011 while he was incarcerated at Miami Correctional Facility. Dkt. 43-2 at 23-25. The defendants refer to Mr. Petro's medical issue as an ongoing chronic condition that "did not appear to be significant" or one that had a significant impact on his daily activities, but state that this condition "arguably may satisfy the Eighth

8

Amendment 'serious medical need' requirement[.]" Dkt. 42 at 17. Therefore, the Court will consider only whether Dr. Talbot was deliberately indifferent to Mr. Petro's medical conditions.

Dr. Talbot testified that during his interactions with Mr. Petro, despite his complaint of pain, he "exhibited good strength, normal range of motion, and consistently had the ability to perform all of his activities of daily living." Dkt. 43-1, ¶ 21. Dr. Talbot provided several forms of treatment to Mr. Petro throughout his care, including continued pain medication and the use of steroid treatment, back supports, a wedge pillow, on-site physical therapy, and exercise plans. *Id.*, ¶ 22. The physical therapist's evaluation was consistent with Dr. Talbot's assessment as well, in that it was noted that Mr. Petro had ambulation without a limp and no atrophy, and flexibility exercises were recommended. Dkt. 43-3 at 31-37, 39-42. When the physical therapist recommended a wedge pillow, Dr. Talbot followed this recommendation. In fact, the physical therapist indicated that Mr. Petro was both expressing and showing improvement. *Id.* at 39, 41.

Mr. Petro contends that Dr. Talbot was unwilling to treat his pain and suffering, or assist him altogether. Dkt. 43-2 at 19. He further alleges that Dr. Talbot was "uncaring," sent him the wrong back braces, prescribed the wrong medications, and did not order an x-ray. *Id.* at 19, 44. But the uncontradicted medical records show that Dr. Talbot examined Mr. Petro, ordered x-rays, provided a lengthy treatment plan, referred Mr. Petro to on-site physical therapy, and monitored Mr. Petro's condition from August 2018 through April 2019. The undisputed record shows that Dr. Talbot was attentive to Mr. Petro's complaints and attempted a broad range of treatments to alleviate Mr. Petro's pain.

Dr. Talbot's course of treatment for Mr. Petro was essentially the same course of treatment that Mr. Petro received from an outside provider, including an anti-inflammatory medication (Mobic), a steroid (Prednisone), and physical therapy. Dkt. 43-2 at 49. Mr. Petro testified during

9

his deposition that he was at that time not wearing a back brace, was able to walk without a walker or a cane, and that his new provider, like Dr. Talbot, has not recommended that Mr. Petro have surgery but counseled him that surgery is a last resort only after other available options have been shown unsuccessful. *Id.* at 51-53, 62.

In his response brief, Mr. Petro outlines his challenges to Dr. Talbot's affidavit, arguing that he submitted various health care request forms for his back pain and that Dr. Talbot did not answer his requests. He requested that Dr. Talbot review his 2011 x-ray prior to August 2018. He claimed that he told Dr. Talbot about his back pain earlier than stated in Dr. Talbot's affidavit and that the back brace given to him was the wrong one. *See* dkt. 45 at 2-10. Mr. Petro argued that it took 10 months to get help with his back. *Id.* at 10. Mr. Petro also claims that he only received medication one time in 6 months and was never provided with exercise plans from Dr. Talbot. *Id.* at 4-5.

But the undisputed medical records tell a different story. Mr. Petro claims that he put in health care request forms regarding his back before August 2018, but there is no evidence that such requests were received or processed by Dr. Talbot. Dkt. 45-1 at 2-3. The medical record shows that Mr. Petro was on prescription pain medication prior to seeing Dr. Talbot for an evaluation of his condition. Dkt. 43-3 at 1-42 (plaintiff's medical records). Mr. Petro's 2011 x-ray was located from his former facility and reviewed by Dr. Talbot, who also ordered and evaluated current x-rays. *Id.* The medical record indicates that Dr. Talbot reviewed the back support and its use with Mr. Petro and ordered another support at Mr. Petro's request. *Id.* The record indicates that Dr. Talbot ordered multiple medications for Mr. Petro and when informed by Mr. Petro that the medication had not been received, Dr. Talbot reordered it. *Id.* The medical record further shows that Dr. Talbot recommended exercises for Mr. Petro to perform. *Id.* Moreover, the medical records

indicate that Dr. Talbot evaluated Mr. Petro's condition on multiple occasions and that the course of treatment was consistent with the progression of his condition. *Id.* For example, Mr. Petro continued to be able to participate in his daily life activities and no recommendation for more advanced treatment or surgery was indicated as necessary. *Id.*

No reasonable jury could conclude that Dr. Talbot was deliberately indifferent to Mr. Petro's medical condition, so he is entitled to summary judgment.

### 2. Wexford

Mr. Petro has not established that he has suffered any constitutional injury, and where there is no constitutional injury, there can be no policy claim. *Jenkins*, 487 F.3d at 492. And even if there were such an injury, Mr. Petro's claim against Wexford is based on its being Dr. Talbot's employer. Dkt. 43-2 at 21. This is a claim of vicarious liability and "[l]iability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "[T]o recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff may not rely on a theory of respondeat superior and must instead allege that the defendant, through his or her own conduct, has violated the Constitution." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Individual liability "may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turn[s] a blind eye to it." *Id*. (citation and quotation marks omitted).

Mr. Petro does not point to or provide evidence that his treatment was the result of any unconstitutional policy or practice of Wexford. His response argues only that Wexford should have known about the pattern in which Dr. Talbot treats inmates due to former lawsuits against him. Dkt. 45 at 14. Accordingly, Wexford is entitled to summary judgment.

## IV. Conclusion

For these reasons, the defendants' motion for summary judgment, dkt. [41], is **granted.**

Final judgment consistent with this Order shall now issue.

**SO ORDERED.**

Date: 11/6/2020

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

ROBERT PETRO
2067 Sunshine Drive
Greenfield, IN 46140

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com